**Carlos SIMONETTI and Anna Simonetti, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 78 C 1155.**

United States District Court, E. D. New York.

March 2, 1982.

**9.** *Gourdine v. Ellis*, 435 F.Supp. 882 (D.S.C. 1977).

Robert D. Becker, New York City, for plaintiffs.

Edward R. Korman, U. S. Atty. by Jan Constantine, Patrick Northup and Robert Begleiter, Asst. U. S. Attys., Brooklyn, N. Y., for defendant.

## MEMORANDUM OF DECISION

GEORGE C. PRATT, District Judge:

Plaintiffs brought this action to recover for injuries claimed to have been caused by a swine flu vaccine administered to plaintiff Carlos Simonetti on October 26, 1976 as part of the national swine flu immunization program. Jurisdiction is not disputed. 28 U.S.C. § 1346(b) & 42 USC § 247(b).

Upon the consent of the parties the court ordered that the issue of causation be tried separately. To that end, evidence was presented to the court, sitting without a jury on January 25 and 26, 1982. Both of the plaintiffs testified. In addition, the direct testimony of Dr. Murray Budabin was submitted in writing. When the government indicated no desire to cross-examine Dr. Budabin, his presence at the trial became unnecessary and his written testimony was deemed part of the record. On behalf of the defendant, Dr. Bennett M. Derby testified. Defendant also submitted the deposition of plaintiff's treating physician, Dr. R. Antonio Troncoso. Reports of various other treating physicians and of Montefiore Hospital where Carlos Simonetti was confined in May, 1977, were placed in evidence.

The court has carefully considered the live testimony, the deposition and written testimony, the exhibits submitted, and the arguments of counsel. This memorandum constitutes the court's decision and includes the court's findings and conclusions pursuant to FRCP 52(a).

It is undisputed that plaintiff received a swine flu shot on October 26, 1976 and that she experienced no immediate reaction to it. Plaintiff testified that about the middle of December he noticed a small numb spot on the sole of his right foot. He paid little attention to it, and it went away. About a month later he noticed a small numb spot on the sole of his left foot. Later, perhaps in January, "maybe much later", his toes began to get numb and his tongue felt funny. He testified that in February he experienced an "explosion of symptoms". His toes became more numb, and he had balance problems that caused him to stumble a lot and fall down steps. Nevertheless, he continued to work.

On March 28th he saw his family physician, Dr. Troncoso, complaining to him for the first time of his neurological symptoms, which included incoordination of both legs, numbness over his toes, and a mild fullness and heaviness sensation of the legs. On April 17th, after examining him again for a continuation of the same symptoms, Dr. Troncoso referred plaintiff to a neurologist, Dr. David Fine.

Dr. Fine reported that plaintiff had noted numbness of his right foot and toes, which had been present to a mild degree for the past four months, but increased in severity in the past month. He also reported numbness of the other foot and both hands, difficulty in walking because of these complaints, weakness in the extremities, an occasional feeling of spasm all over his body, and "on one occasion" a weird feeling over the tip of his tongue. On neurologic examination plaintiff disclosed a generalized areflexia (absence of deep tendon reflexes). Dr. Fine's preliminary diagnosis was "a polyneuropathy with minimal degrees of weakness and some mild sensory loss".

Under Dr. Fine's care plaintiff was treated in Montefiore Hospital from May 12 through May 27, 1977. After that treatment Dr. Fine concluded that he had "a chronic progressive polyneuropathy".

Plaintiff was referred to Dr. Michael Swerdlow, a neurologist at Montefiore Hospital, under whose care he gradually recovered so that as of 1980 his symptoms had basically disappeared. At the time of trial plaintiff complained of occasional feelings of numbness and some weakness in one arm. The loss of sensation during sexual activities that plaintiff had experienced at the height of his disease, had disappeared some 6 to 12 months before trial.

Relying on references in the medical records and the opinion of Dr. Murray Budabin, plaintiff claims to have suffered from Guillian-Barre Syndrome (GBS) caused by the swine flu vaccine. That diagnosis was listed by Dr. Troncoso as a possibility when he examined plaintiff on April 11, 1977. It was also listed in the discharge summary of the Montefiore Hospital record, a summary that was dictated by a resident at the hospital approximately nine months after the discharge.

In the opinion of Dr. Budabin, plaintiff's illness represented a form of GBS. Dr. Budabin pointed out that sensory complaints began about one and one-half months after the injection, progressed to the hands and feet, eventually involved the face and later caused problems with motor performance, balance, coordination, strength and the autonomic nervous system. According to Dr. Budabin, GBS is a diverse collection of signs and symptoms that cannot be too closely delimited. Its pathology is an inflammatory condition of undetermined etiology, perhaps due to viral infection or perhaps secondary to immunological challenge.

Dr. Budabin pointed out that although plaintiff's initial symptoms were sensory and only later evolved into symptoms affecting his motor system, nevertheless, from the time of his first motor complaint to the time of his neurologic referral to Dr. Fine, only about five weeks elapsed, a period that fits the criteria for the period determined for motor weaknesses to develop as determined by the authors of an article in the Annals of Neurology. Dr. Budabin expressed his opinion that the swine flu inoculation of October, 1976 caused plaintiff's condition, because the sensory component "followed hard upon the history of swine flu inoculation".

When asked if plaintiff's was a typical case of GBS, Dr. Budabin acknowledged that plaintiff presented a "most extraordinary concatenation of signs and symptoms" and that plaintiff's case was "rather unusual and bizarre". Nevertheless, he did feel that "many of these characteristics still does permit it to be labeled as Guillian-Barre Syndrome".

At the time Dr. Budabin examined plaintiff on December 27, 1981, plaintiff showed no clinical signs of having had GBS, but according to Dr. Budabin, plaintiff's recent complaints of numbness in his legs and chronic constipation were consistent with having had GBS.

Defendant argues that plaintiff did not have GBS or any other condition caused by the swine flu vaccine. In the opinion of Dr. Derby, plaintiff suffered from an idiopathic chronic polyradiculoneuropathy of which GBS is a specialized form, but that plaintiff did not have the specialized form. According to Dr. Derby GBS appears at the maximum, 10 weeks after the triggering event which in the swine flu cases is assumed to be the inoculation, but which may also be any of a variety of viral illnesses. Once it begins, GBS evolves rapidly in a period of two to four weeks. After another two to four weeks recovery begins and, while it may be delayed for months, it is never delayed for years.

Dr. Derby acknowledged that plaintiff presented some features of GBS such as sensory loss, muscle weakness, absence of deep tendon reflexes, and elevated protein in the spinal fluid. Those symptoms, however, merely establish that plaintiff had a disease involving roots of his nerves. According to Dr. Derby, plaintiff's picture lacks the swift evolution after onset, the prompt beginning of recovery once progression has stopped, and the recovery which is full, as far as it is going to go, within a time period of approximately one year, all of which are part of GBS.

According to Dr. Derby, GBS is primarily a muscle, not a sensory problem; but plaintiff's problems, for months, were sensory, not muscular. Moreover, plaintiff's recovery was strung out over three years, not concentrated into a few months. Weighing those and other factors, Dr. Derby concluded that plaintiff did not have GBS. The constipation referred to by Dr. Budabin as a symptom of GBS, is, according to Dr. Derby, never involved in polyneuropathy of any kind, including GBS. The same was true with respect to plaintiff's symptoms of urinary dribbling, and the sensation of altered penile sensation.

The question for the court to determine is whether plaintiff's conceded medical problems, whatever they may be labeled in the textbooks, were caused by the swine flu vaccine. If plaintiff were given the benefit of every favorable inference, his case is marginal when viewed within the temporal range of problems that followed swine flu inoculations as shown by the epidemiological studies.

The claimed numb spot in mid-December, 1976 is the only neurological symptom that occurred early enough to even remotely be related causally to the swine flu vaccine. With respect to that claim, however, there is a sharp issue of credibility. Plaintiff paints a picture of increasingly severe symptoms beginning December, 1976 and continuing up to the time of his admission to the hospital in May, 1977. If liability is to be established in this litigation, plaintiff, of course, would have to connect the later problems that occurred with the vaccine that was given in October, 1976. The question is, was there such a connection? Or, was the testimony at the trial merely structured to give that impression?

The court concludes that plaintiff has failed to establish the causal connection by a fair preponderance of the credible evidence. The court's problem in making that determination is one of whether it is more likely that the vaccine caused plaintiff's problems in the spring of 1977 than not. The evidence supporting the existence of the sensory problems plaintiff described is plaintiff's own testimony, which was weak and hesitant, and a single reference in exhibit 6, a letter from Dr. Fine to Dr. Troncoso, in which he states "Mr. Simonetti has noted the numbness of his right foot and toes for the past four months." The date of the letter was April 27, 1977; four months earlier would be December 27, 1976. Obviously, the four month period referred to is an approximation. However, plaintiff did not testify to numbness of his "right foot and toes" for that period, but, instead, only began with a numb spot on the sole of his right foot in December of 1976 which, a month later, moved to the sole of his left foot.

Beyond those minor weaknesses, there is strong evidence to negate plaintiff's story of growing sensory problems beginning in December of 1976. In mid-December plaintiff saw Dr. Troncoso for stomach and digestive problems, but he made no reference to any numbness. On February 1, 1977, plaintiff saw Dr. Troncoso again, also for stomach problems, and still there was no complaint of numbness or any other neurological symptom.

At trial plaintiff testified that in February he experienced an "explosion of symptoms", some of which caused him to stumble and fall, yet even so, he did not go to see his doctor until March 28. If plaintiff were a stoic, uncomplaining type of person who would be inclined to ignore aberrational functions in his body, at least until they became intolerable, it might then be possible to reconcile plaintiff's story with his actual conduct at the time. Plaintiff's entire history, however, negates any such attitude on his part. He had received psychotherapy for being a hypochondriac. His many visits to Dr. Troncoso over the previous four years reflect a pattern of minor, even trivial complaints, including such matters as warts, bumps, sore throats and other minor conditions. While it may be that looking back, particularly in the context of the pending litigation, the plaintiff sincerely believes that the beginning of his neurological problems was in December, 1976 rather than March, 1977, on the evidence

before the court, it must, nevertheless, be concluded that it is more probable than not that plaintiff experienced no neurological symptoms until approximately mid-March, 1977. Given such a time gap of at least four and one-half months between the swine flu shot and the onset of any neurological symptoms, the court finds and concludes that the neurological problems experienced by plaintiff in the spring of 1977 and thereafter were not caused by the swine flu vaccine.

Since plaintiff has failed to establish the necessary causal connection, the complaint must be dismissed. The clerk is directed to enter judgment accordingly.

SO ORDERED.